IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                    PLAINTIFF/RESPONDENT

v.

Criminal No. 07-50037-02

RONALD ANTONIO MOOREHEAD                    DEFENDANT/MOVANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

On July 20, 2011, Defendant filed a Motion for Judicial Review of the Government's Failure to File a Rule 35(b) Motion on Behalf of Defendant. (Doc. 85). This motion was referred to the undersigned for a Report and Recommendation on July 22, 2011. (Doc. 86).

**I.      Background and Evidence Presented:**

Defendant pled guilty to knowingly possessing with the intent to distribute more than 50 grams of a mixture or substance containing crack cocaine, and on March 20, 2008, he was sentenced to 262 months in prison; five years supervised release; $100.00 Special Assessment; $10.000.00 fine; and permanent denial of federal benefits. (Doc. 58). Defendant's sentence was affirmed on appeal.  United States v. Moorehead, No. 08-1765, 2009 WL 1977747 (8th Cir. 2009).

On July 20, 2011, Defendant filed the Motion now before the Court, and a hearing was conducted on April 5, 2012. At the hearing, the following witnesses testified: Defendant; inmate Michael E. Brown; Assistant Federal Public Defender Jack Schisler; FBI Special Agent Brian Tichenor; and Assistant United States Attorney (AUSA) Angela Jegley.

-1-

AO72A
(Rev. 8/82)

In addition to the testimony of the witnesses, the following Exhibits[1] were admitted at the hearing: 1) Defendant's Exhibit 1: a Per Curiam opinion regarding Leon Nash; 2) Defendant's Exhibit 2: a Motion For Downward Departure filed by AUSA Patrick C. Harris on behalf of Derrick Caffey; 3) Defendant's Exhibit 3: an e-mail dated December 22, 2009, from Agent Tichenor to Michael Brown; 4) Government's Exhibit 1: 2 letters from Defendant dated December 17, 2008, and December 27, 2008, and a statement of facts; and 5) Government's Exhibit 2: an e-mail dated December 7, 2009, from Ms. Jegley to Mr. Schisler.

The following exhibits were obtained and admitted subsequent to the hearing: 1) Court Exhibit 1: an email from Corrlinks; 2) Court Exhibit 2: Defendant's e-mail and telephone log; and 3) Court Exhibit 3: Affidavits from Agent Tichenor and AUSA Jegley.[2]

The witness testimony presented will be summarized below.

**A.     Testimony of Ronald Antonio Moorehead**:

Defendant testified that in October of 2008 he met a fellow inmate at the Federal Correctional Institution in Yazoo City named Kenneth Shue. Defendant testified that one day he was talking with Shue and Derrick Caffey about guys that they knew from Little Rock. During the conversation, Defendant said that he knew two of the guys, a Junebug and a Chad Ross, that were recently arrested. Defendant said he was told that the authorities were also looking for Antoine Nelson, and Defendant noted that he knew Nelson as he was from his area, the Camden

---

[1]The Court notes that upon the request of Defendant, with no objection from the Government, Defendant's Exhibits 2 and 3 and the Government's Exhibits 1 and 2 are held under seal due to safety concerns related to providing information to the Government against other individuals.

[2] The Court directed Agent Tichenor and AUSA Jegley to search their e-mail accounts for any e-mail correspondence with Defendant; with each other regarding Defendant and Michael Brown; or between Agent Tichenor and FBI Special Agent Chad Coulter regarding Defendant. Agent Tichenor and AUSA Jegley submitted affidavits stating no such correspondence could be located. (Court Exhibit 3).

AO72A
(Rev. 8/82)

area.  Defendant testified that when he told Shue and Caffey that he knew Junebug, Ross and Nelson, they told Defendant that the FBI might be interested in speaking with him and suggested that he call FBI Agent Brian Tichenor.

Defendant testified that sometime during the first or second week of December 2008, he called Agent Tichenor.  At that time, Agent Tichenor asked Defendant who the prosecutor had been in his case, and his attorney's name, as he said he needed to get permission from that prosecutor before they started talking.  Defendant testified that he called Agent Tichenor again, and at that time was told by Agent Tichenor that everything had been cleared, and that Defendant could send him a written statement.  Defendant testified that he typed up his statement and sent it to Agent Tichenor.  (Government Exhibit 1).  In the statement Defendant detailed information he and Michael Brown could provide regarding purchases of crack cocaine from Ross.

The Court questioned Defendant about his conversation with Agent Tichenor, and if Defendant asked Agent Tichenor what he would get in return for the information given. Defendant testified that Agent Tichenor told him that if the information was credible, he might get something, but that Agent Tichenor would have to talk to the prosecutor first.  Defendant testified that no promises were made at that time.

Defendant testified that he called Agent Tichenor sometime after the new year, and that Agent Tichenor had said he had handed the information over to AUSA Jegley.  Agent Tichenor told Defendant that he would have to get back to him later, as he was waiting to hear back from AUSA Jegley.

Defendant testified that the next time he called Agent Tichenor they talked about Nelson. At that time, Agent Tichenor told Defendant that AUSA Jegley had liked the written statement

-3-

he provided and that it would probably be used.  Defendant asked what he would get if the statement was used, and Agent Tichenor said it was all up to the prosecutor, but more than likely Defendant would get a sentence reduction.

Defendant testified that he called Agent Tichenor again a few weeks later.  At that time, Agent Tichenor told him that the first court date was set for June or July, and that Defendant would probably be writted out and brought to Little Rock to testify in the Ross trial.

Defendant testified that a month or so later, Andre Sain, Ross's stepson, pled guilty. Defendant testified that he asked Agent Tichenor about that, and that Agent Tichenor told him even if they pled guilty, Defendant was not to worry because he would still "get something." Defendant testified that it was at this point the assurances started to be given.  Defendant testified that Agent Tichenor had told him that he knew AUSA Jegley would file a Rule 35 recommendation. Defendant testified that when he asked Agent Tichenor how this worked, Agent Tichenor told him that usually he would make his recommendation to the prosecutor, who would then make a Rule 35 recommendation.  Defendant testified that Agent Tichenor had checked out the information given by Defendant in his written statement, and that the information was good, and that because of this, Defendant was placed on the witness list for the Ross trial.  Defendant testified that he talked to Agent Tichenor a few times by e-mail and the telephone to get updates.

Defendant testified that around June or July of 2009, he, Brown, Caffey, and two other inmates were picked up by the United States Marshals, and were taken to Jefferson County Detention Center (Jefferson County).   Defendant was returned to Yazoo City without being interviewed or ever speaking to AUSA Jegley, and he did not speak to Agent Tichenor until the day before he left Jefferson County, or the day that he returned to Yazoo City, at which time,

-4-

Agent Tichenor informed him that the trial had been continued because Ross had fired his attorney. Agent Tichenor told Defendant that the next court date was set for October 27th or 28th. Defendant testified that he kept in contact with Agent Tichenor through e-mail and by telephone.

Defendant testified that around October 15, 2009, he and other witnesses were transported through Oklahoma City to Mason, Tennessee. Defendant testified that when the United States Marshals came to pick them up in Mason, his paperwork had been lost, so he remained in Mason while the other witnesses went to Jefferson County. Defendant testified that he was picked up the following Monday morning, and arrived at Jefferson County around four or five in the afternoon. Defendant testified that when he arrived at Jefferson County, he was placed in the B pod, and that the first person he saw was Sain. Defendant stated that Sain looked at him crazy because he knew why Defendant was there. Defendant testified that later that day when he saw Brown, Brown had told him that Sain had words with Brown because Sain was upset that Brown was going to testify.

Defendant testified that he waited for the United States Marshals to transport them to the courthouse, but nothing happened. Defendant and Brown called Agent Tichenor from the jail, and they were told that Ross had pled guilty. Defendant testified that Agent Tichenor told him that he was going to e-mail AUSA Jegley right then to ask about a sentence reduction. Defendant testified that Agent Tichenor said he was going to try to get Defendant and Brown a reduction.

Defendant testified that they were transferred back to Mason about one week later, and when he arrived, the first person that he saw was Sain. The next day, Sain and Defendant spoke and Sain told him that he was not "trippin" anymore, and that he was not upset with Defendant.

-5-

Sain told Defendant that he had been told that Defendant and others were going to testify against Ross.

Defendant testified that a day or two after he arrived back at Yazoo City, he called Agent Tichenor.  Defendant testified that he asked Agent Tichenor about the e-mail that was sent to AUSA Jegley, and that Agent Tichenor told Defendant that everything was on track.  Defendant testified that when he called Agent Tichenor a couple of weeks later, he was told there had been complications because AUSA Jegley had interviewed Brown when he was transported to Jefferson County in October 2009, and she did not believe the information he provided; Defendant noted that he was never interviewed.  Defendant testified that Agent Tichenor told him that he believed Defendant but that AUSA Jegley thought Brown was lying.  Defendant asked Agent Tichenor why AUSA Jegley thought Brown was lying and he was told that Brown's story did not sound right.  At that time, Defendant told Agent Tichenor that he would get back with him.  When Defendant called Agent Tichenor a few days after Christmas, Agent Tichenor told Defendant that he would probably not get anything because they did not believe Brown.

Defendant testified that he sent an e-mail to Agent Tichenor stating that he left Yazoo City twice to testify against Ross, and that the refusal to give him a sentence reduction was not right, because he was being called a snitch.  Defendant testified that Agent Tichenor told Defendant that he had no control, as the decision was up to AUSA Jegley.  Defendant testified that he called Agent Tichenor after receiving this e-mail and said to Agent Tichenor:

> look man the whole time you have been giving me assurances from her because you telling me I have to send everything through you to her... I said now you trying to tell me after I did everything I did that I don't have anything coming and that you don't have no control over it.

Defendant testified that Agent Tichenor told him that he was sorry. At that point, Defendant took Agent Tichenor off his e-mail and telephone list.

Upon cross-examination by the Government, Defendant testified that he arrived at Yazoo City on September 2, 2008. When questioned about meeting up with Leon Nash, Defendant testified that he did not run into Nash until sometime in December of 2008. Defendant testified that he never spoke to Nash about the Ross case until after he had sent the letter to Agent Tichenor. Defendant testified that he had no idea if Nash was recruiting people to testify against Ross. Defendant testified that he spoke to Nash after Nash testified at the grand jury, but there was no conversation about the case.

Defendant testified that he came up with the idea to write a statement regarding Ross. Defendant testified that since September 2008, he was looking for ways to reduce his sentence. When asked if Agent Tichenor ever explicitly said "you will get a reduction" in your sentence, Defendant testified that he was told that if his information was credible, and the information was used, that he would receive a reduction. Defendant testified that later Agent Tichenor told him that AUSA Jegley would also have to agree to give Defendant credit. Defendant testified that Agent Tichenor never told him that he would "go home tomorrow," but he was told that even if Ross pled guilty, he would get some type of reduction.

Defendant testified that with the exception of the written statements he made, he never talked to Agent Tichenor specifically about the information he had given. Defendant testified that he was never interviewed by Agent Tichenor or AUSA Jegley, or asked for greater detail regarding the information he had given.

-7-

Defendant testified that his dealings with Ross all included Brown, and that he would think that Brown's story would be similar to his story. When questioned if Agent Tichenor told him that the information he gave was used in the Ross case, Defendant acknowledged that neither Agent Tichenor nor AUSA Jegley ever told him that the information he gave was used in the Ross case. Defendant testified that Agent Tichenor told Defendant that he was sending an e-mail to AUSA Jegley to make sure that Defendant could "get the most that he could get." Defendant testified that if Agent Tichenor had never told him he would get a reduction, he would never have assumed that he was going to get anything.

**B.    Testimony of Michael E. Brown:**

Brown testified that he first heard of Agent Tichenor through Shue, who gave him Agent Tichenor's number. Brown testified that he learned that Ross had been arrested through Shue.

Brown testified that he really did not know Nash, and that Nash was not in Yazoo City long. Brown testified that he did not talk to Nash about snitching because he did not know Nash. Brown denied that Nash provided him with information about Sain and Ross.

When asked what made him want to send information to Agent Tichenor, Brown testified that Agent Tichenor said that if the information he gave was substantial, Agent Tichenor would hand the information over to the prosecutor. Brown testified that Agent Tichenor told him that AUSA Jegley liked his statement, and that he would be writted out. Brown testified that the first time he left Yazoo City, he was in a van with Defendant, Caffey, and other guys that he did not know. Brown testified that when he arrived in Jefferson County that he saw Sain, but they did not talk to each other.

-8-

Brown testified that in October 2009, he was interviewed by AUSA Jegley and Agent Tichenor, and that AUSA Jegley told him that Sain had told her that he did not know Brown. Brown testified that he told AUSA Jegley he did not know why Sain would say that, but Brown noted that in his criminal case "everyone said the same thing." Brown testified that AUSA Jegley asked him if Nash mentioned the Ross case to him. Brown testified that he only talked to Nash a little bit in the holding cell, but that Nash did ask him to tell AUSA Jegley that Nash had told him about the Ross case.

Brown testified that when he met with AUSA Jegley in October 2009, that was the first time that she went over the information given by Brown and Defendant. Brown testified that during the interview, AUSA Jegley asked if he was lying, to which he responded that he was not. Brown testified that AUSA Jegley said that whether he testified or not, he could still get something, but there was no certainty that he would get anything. Brown testified that Agent Tichenor had also assured him that if he went through with everything, he would get what he was supposed to get. Brown testified that neither AUSA Jegley nor Agent Tichenor gave him an assurance of anything. Brown testified that he could not recall if he was told that he would be going to court. Brown testified that he understood that AUSA Jegley may not have believed him because Sain told her that he did not know Brown in the free world.

Brown testified that after he found out Ross had pled guilty, he was in contact with Agent Tichenor by e-mail and telephone. In an e-mail dated December 21, 2009, Brown stated:

> Mr. Tichenor, this is Michael Brown, I'm writing concerning my part I played in the Carl Ross trial. I know that he pled out, but shouldn't I still be intitled [sic] to something. I was summoned on a writ twice and I did all I could do, it isn't my fault he pled out or if anyone else didn't do what they were suppose to do. Thats what we wanted right? A conviction. I'll be happy at least with the minimum cut

AO72A
(Rev. 8/82)

possible.  I was willing to get on the stand an [sic] testify. I'm in prison Mr. Tichenor, it doesn't look good for me to leave twice like I did and not receive anything.  I have been called a snitch and everything, which doesn't bother me. But we are talking bout [sic] my safety.

(Defendant's Exhibit 3).  On December 22, 2009, Agent Tichenor responded:

I will talk with AUSA Jegley and try and talk her into getting some more help for you.  I[n] the end she makes the final decisions though.

Id.

When questioned about this e-mail, Brown testified that Agent Tichenor had been saying all along that Brown and Defendant would "get help," but he never gave them any percentages. Brown testified that before the December 22, 2009 e-mail, Agent Tichenor never said the decision would be up to AUSA Jegley.

**C.**   **Testimony of Jack Schisler**:

Mr. Jack Schisler testified that he has been an Assistant Federal Public Defender for fifteen years, and that he represented Defendant in his criminal case.  Mr. Schisler testified that he and Defendant had a conversation regarding information Defendant had provided in the Ross case, and that he recalled Defendant wanted him to inquire to AUSA Jegley about this information.  Mr. Schisler testified that he sent an e-mail to AUSA Jegley and that AUSA Jegley had responded that she believed the information given by Brown and Defendant was false and that she was not going to be filing a Rule 35 Motion.  (Government Exhibit 2).

Mr. Schisler testified that he has a standard talk with all of his clients about 5K1 departures and substantial assistance reductions.  Mr. Schisler testified that he tells his clients that the government  is not promising anything, but will promise to consider the information given. Mr. Schisler testified that there had been occasions where the information given was truthful, but

-10-

it was just not used, so nothing was given to the individual. Mr. Schisler testified that if someone has information, the general course of action is for the person to write a statement and to send it to the agent or prosecutor and that after the statement is reviewed, the prosecutor or agent will then interview the person about the information. Mr. Schisler testified that there had been occasions when he thought his client had given substantial information but the prosecutor or case agent disagreed. Mr. Schisler testified that he tells his clients that there is no guarantee.

Mr. Schisler testified that he was sure that he talked about a 5K1 departure to Defendant at some point, but he did not know how he explained the process to Defendant particularly. Mr. Schisler testified that he was also sure that sometime during the process he explained to Defendant how a Rule 35 motion worked. Mr. Schisler testified that Defendant had made a lot of attempts to receive a Rule 35 reduction, so he had been in contact with a number of agents regarding Defendant's case.

### D.   **Testimony of Agent Brian Tichenor:**

Agent Brian Tichenor testified that he is a Special Agent with the FBI in Little Rock Arkansas. Agent Tichenor testified that after Defendant contacted him by telephone and had sent him a written statement, he contacted AUSA Jegley to inform her that there were additional witnesses willing to cooperate against Ross. Agent Tichenor did not remember contacting Defendant's AUSA, but he did contact AUSA Jegley directly. Agent Tichenor forwarded the written statement to AUSA Jegley, and they discussed the potential of Defendant being a witness at Ross's upcoming trial. Agent Tichenor testified that when the statement was received, it seemed like good information at that time and appeared like it would assist them in their investigation.

-11-

Agent Tichenor testified that after the June trial date but prior to the October trial date, he and AUSA Jegley had an on-going discussion about who would continue to be on the witness list. Agent Tichenor testified that who made the witness list was determined by interviews and information that was corroborated or not corroborated. Agent Tichenor testified that they were never able to corroborate the information provided by Defendant. Agent Tichenor testified that he wanted to be able to meet Defendant and speak to him face-to-face. Agent Tichenor testified that he received two to three e-mails from Defendant, and that he responded back once or twice.

When questioned about the October 2009 interview with Brown, Agent Tichenor testified that he and AUSA Jegley were on a "heightened sense of suspicion" after conducting the first interview with Sain, who informed Agent Tichenor and AUSA Jegley that there were individuals who did not know Ross who had been conspiring to provide information against Ross. Agent Tichenor testified that Sain told them that Brown did not know Ross. Agent Tichenor testified that AUSA Jegley conducted most of the interviews and that she did confront Brown with Sain's statements because they were trying to "flesh out the truth." Agent Tichenor testified that some of the information provided by Brown was not consistent with what was believed to be accurate based on their investigation of Ross and his associates. Agent Tichenor testified that Brown's demeanor also appeared too eager to assist, and that they just did not believe Brown's information was truthful. After this interview, Agent Tichenor did not recall contacting Defendant or Brown, but he testified that Defendant or Brown may have contacted him.

Agent Tichenor testified that he never told Defendant that he was or was not a representative of AUSA Jegley. Agent Tichenor testified that he told Defendant to send the statements to him, and that he would then provide the statements to AUSA Jegley. Agent

-12-

Tichenor explained that he was the investigator, and that AUSA Jegley was the prosecutor so he would be the one to gather the information.  Agent Tichenor testified that within a month of Ross's guilty plea,  he thought he and Defendant had a conversation over the telephone.  Agent Tichenor did not recall speaking to Defendant and Brown while they were still at Jefferson County, and testified that he never told them that he would e-mail AUSA Jegley to see what he could get for them.  Agent Tichenor testified that he never made any promises to Defendant or Brown over the telephone or in an e-mail that he would get them a reduction. Agent Tichenor testified that Defendant made it clear that he wanted a time reduction for any information given. Agent Tichenor testified that he told Defendant that any information given would be evaluated and sent to AUSA Jegley, and that he did not have the authority to make any promises regarding a sentence reduction.

Agent Tichenor testified that three people in the Ross case did receive a Rule 35 reduction. Agent Tichenor explained that after the interviews in October of 2009, three of the eight individuals interviewed were determined to be credible witnesses.  Agent Tichenor testified that these three individuals received a Rule 35 reduction because the information they provided was deemed credible, and the prosecution had intended to use the information in the trial against Ross. Agent Tichenor testified that they were able to determine that the information from these three individuals was credible through discussions with individuals that were known for a fact to have dealt with Ross.  Agent Tichenor testified that the information provided by the five other individuals was not deemed credible and the prosecution was not planning on using that information in the Ross trial.  Agent Tichenor testified that they had decided not to use Brown as a witness, and that because they thought of Defendant and Brown as a team or a pair, they decided

-13-

that if they could not believe Brown, they could not believe Defendant.  Agent Tichenor testified that none of the information given by Defendant or Brown had been used as a basis for Ross's guilty plea.

Agent Tichenor testified that he did not believe or disbelieve Defendant.  Agent Tichenor stated that his policy is to provide the information to the prosecutor, and then before he would even think to put someone on the stand, he would do a face-to-face interview with the individual.  Agent Tichenor testified that he never interviewed Defendant, and that, to this day, he could not say if the information provided by Defendant in his written statement was true or untrue.

When questioned about Nash, Agent Tichenor testified that they knew Nash had dealings with Ross, but that Nash did not receive a Rule 35 reduction because he had provided conflicting statements.  Agent Tichenor explained that Nash's statements to the grand jury conflicted with the statements Nash gave to them during interviews.  Agent Tichenor testified that it was not until two days before the Ross trial that Nash's credibility came into question.  When questioned about Nash's alleged recruitment of individuals to testify in the Ross trial, Agent Tichenor testified that he believed that Nash had recruited individuals.  Agent Tichenor testified that Nash had told them that he wanted credit for the information that he had provided, and for all of the individuals he brought on board to testify against Ross.  Agent Tichenor testified that he did not ask Brown if Nash had tried to recruit him.

When questioned by the Government about the December 22, 2009 e-mail to Brown, Agent Tichenor testified that he did not want to look like the "bad guy" by coming right out and telling Brown that he was not going to receive a sentence reduction.  Agent Tichenor testified that he would "pass the buck" on to AUSA Jegley because he did not want to have a reputation with

-14-

inmates in the Bureau of Prisons (BOP) as being a "liar" or someone who did not follow through with his word. Agent Tichenor testified that would be counterproductive with his investigations because witnesses would not want to talk to him.

When questioned about what he meant in the e-mail when he said that he would try to get Brown "more help," Agent Tichenor testified that Brown's e-mail made mention of some concerns for his safety, and that it was not uncommon for an agent to call the BOP, and to request that an individual be moved. Agent Tichenor testified that could have been what he meant by "more help," or the "more help" could have referred to a sentence reduction, but that he did not have the authority to make those decisions. When questioned by the Court, Agent Tichenor conceded that if safety was the "more help" he had been referring to in the e-mail, Agent Tichenor could have called the BOP without conferring with AUSA Jegley, so the "more help" in the e-mail must have meant a sentence reduction. Agent Tichenor testified that he could not explain why he had said "**more help** (emphasis added)," if he had never promised Brown **any** help. As Agent Tichenor testified that he had all along told Defendant and Brown that AUSA Jegley would be the one to decide whether or not to move for a sentence reduction, the Court questioned why he would think he would look like a "bad guy" if he had simply been candid with Defendant and Brown and informed them that AUSA Jegley had decided not to file a Rule 35 motion. Agent Tichenor testified that he did not want them to feel that all hope was lost in their case, and that if they wanted to be mad at someone, not to be mad at him. Agent Tichenor acknowledged that perhaps he should have just "nipped it in the bud" and informed Defendant and Brown that they were not going to receive a sentence reduction.

AO72A
(Rev. 8/82)

When questioned about correspondence with inmates, Agent Tichenor testified that he could e-mail inmates in the BOP through Corrlinks. As previously noted, Agent Tichenor could not locate any e-mail correspondence he had with Defendant or with AUSA Jegley regarding Defendant or Brown. Agent Tichenor testified that he contacted the Corrlinks site administrator, and was told that Corrlinks only maintained their e-mail system for thirty days, and that after thirty days, the e-mails are purged and are no longer accessible.[3] When questioned by the Court about how he kept track of his e-mails from inmates, Agent Tichenor testified that he has printed e-mails off before, but that he did not print the December 22, 2009 e-mail in question. Agent Tichenor testified that he does not keep e-mails or take notes of conversations with inmates because most of the correspondence consists of "what is the status of the case" or "when is the trial date." Agent Tichenor testified that he does not take notes because he likes to have inmates write him a letter that he will then keep.

### E. <u>Testimony of Angela Jegley</u>:

Angela Jegley testified that she has been an Assistant United States Attorney for the Eastern District of Arkansas for about fifteen and one-half years. Ms. Jegley testified that the practice in the Eastern District is to have someone provide a written statement, and if there is potential information, then an ASR will be issued as a mechanism to bring the individual up to be interviewed to see if he/she might become a witness for a trial. Ms. Jegley testified that it is

---

[3] The Court notes that an e-mail dated April 6, 2012, from Corrlinks Support indicates that all requests for Corrlinks data must be requested from the respective Department of Corrections. (Court Exhibit 1). By Order dated April 9, 2012, the Court directed the Clerk of the Court to issue a subpoena duces tecum to Warden Bruce Pearson of Yazoo City Medium FCI, requiring the production of telephone records/logs of Defendant, as well as copies of any emails sent and received through Corrlinks between Defendant and Agent Tichenor for a specified period of time. These documents were received by the Court on April 24, 2012, and show the calls made by Defendant. (Court Exhibit 2). The documents also show three incoming e-mails, the last one dated January 5, 2010, from Agent Tichenor to Defendant; and six outgoing e-mails, the last one dated January 26, 2010, from Defendant to Agent Tichenor. (Court Exhibit 2).

-16-

not common for interviews to be conducted at the prisons.  Ms. Jegley testified that they use the interviews to weed out people.

Ms. Jegley testified that as the Ross case progressed over time, almost everyone involved pled guilty.  Ms. Jegley decided not to interview the individuals for whom they issued ASR's for the June trial date, as Ross fired his attorney on the eve of trial.  Nine ASR's were re-issued for individuals to be interviewed prior to the October trial date.  Ms. Jegley testified that on October 26th, she and Agent Tichenor went to the jail to interview the potential witnesses.  Ms. Jegley testified that during the October interviews, the first individual that they interviewed was Sain, Ross's step-son.  Sain was upset because he said that there were other people locked up with him that were trying to get information from him and each other so that they could have information to use to testify against his step-father.  Ms. Jegley testified that Sain was prepared to testify but that Sain seemed to be incensed that other people would make up information that was not true to testify against Ross.  Ms. Jegley testified that it appeared that people were trying to obtain information so that it looked like they knew Ross and that this "colored" their view of the information that they were given during the remaining interviews.

Ms. Jegley testified that the next person interviewed was Nash.  Ms. Jegley testified that Nash did not receive any credit because Nash had previously testified in front of the grand jury and that testimony contradicted the testimony that he gave during the interview.  Ms. Jegley testified that Nash recounted a transaction that had occurred at a time when Sain was incarcerated and therefore what Nash said happened could not have happened. Ms. Jegley testified that she thought Nash believed that if he embellished the information that he had he would get a greater sentence reduction.  Ms. Jegley testified that she did confront Nash about the inconsistencies and

-17-

that Nash had told them that he wanted credit for his information and for the information from the "guys" he brought.  Ms. Jegley testified that she interpreted the "guys" to be the individuals from Yazoo City.

Ms. Jegley testified that the picture at that point was that Nash had been incarcerated in Yazoo City, and that in early December 2008, Nash testified before the grand jury, and then two to three weeks, possibly four weeks later, Agent Tichenor received a letter from Defendant and Brown, who were also at Yazoo City, claiming to have information about Ross.[4] Ms. Jegley testified that she became more concerned that Defendant and Brown had no personal knowledge about Ross or Sain and that they were relying on information from Nash.  Ms. Jegley testified that with this information on her mind, they began interviewing the remaining individuals.

With regard to the interview with Brown, Ms. Jegley testified that the only information that they had came from Defendant's written statement,  in which Defendant claimed he and Brown participated together in several drug transactions with Ross, and one transaction including Sain.  Ms. Jegley testified that in her mind, Brown's information and Defendant's information were identical and that Brown and Defendant were viewed as "one person" because they had the same alleged story.   Ms. Jegley testified that Brown's interview was one of the last interviews, and that they had interviewed a number of people already from Yazoo City and they did not appear credible.  Ms. Jegley testified that their body language was not right, they could not give details about transactions that they said happened, and they were simply not believable.   Ms. Jegley testified that by the time they got to Brown's interview, she was to the point where she felt

---

[4]The Court contacted the BOP.  Nash was incarcerated at Yazoo City from October 14, 2008, to January 13, 2009.

like she could not believe anyone that they had interviewed.  Ms. Jegley testified that during the interview, Brown was very overly eager to participate and his demeanor did not strike her as someone that was telling the truth.

Ms. Jegley testified that after all the interviews had been conducted, they decided that they could use only three of the eight people as witnesses, as she did not believe the remaining individuals were credible.  With regard to Brown and Defendant, Ms. Jegley testified that she did not believe the information provided by Defendant and Brown was consistent with the information they had about the way Ross was dealing drugs.  Ms. Jegley testified that if she did not believe the core story provided by Brown, she was not going to believe the same core story provided by Defendant.  Ms. Jegley testified that she had even tried to contact the United States Marshal to stop Defendant from being transported to Jefferson County.

In her original response to Defendant's Rule 35 motion, Ms. Jegley stated that Defendant was the one who had been interviewed in October and "there was no question that [he] was lying and had made up the whole account." (Doc. 89 at pg. 2).  Ms. Jegley explained at the hearing that she mistakenly stated that she had interviewed Defendant.   Ms. Jegley testified that she considered Defendant and Brown to be one person and that she knew one of them had not been transported to Jefferson County with the other potential witnesses.  Ms. Jegley testified that she got Brown confused with Defendant and that it essentially did not matter who was interviewed because she did not find their core story to be credible.

With regard to the timing of the Ross plea, Ms. Jegley testified that she found out about the plea Tuesday,  the day after the interviews.  Ms. Jegley testified that she was shocked that Ross had decided to change his plea, and that, because they had not determined until the end of

-19-

Monday who they were going to use as witnesses in the trial, she had not provided a witness list to the defense until the change of plea hearing.  Ms. Jegley testified that she did not provide the defense with any names for the purpose of inducing Ross's guilty plea.  Ms. Jegley testified that the individuals that she referenced at Ross's change of plea hearing were the same individuals that had a Rule 35 motion filed in their respective cases.

Ms. Jegley testified that the three individuals that received credit were all African American.  Ms. Jegley testified that she did not deny a Rule 35 reduction to any individual as a result of their race.

Ms. Jegley testified that the final decision for a Rule 35 or 5K1 motion rests with the prosecutor's office and not the agent.  Ms. Jegley explained that before any motion is filed, it must be presented by way of a recommendation and approved by a committee in her office made up of the criminal chief, the first assistant, and another AUSA.  Ms. Jegley testified that the recommendation must be supported by facts detailing how the individual provided substantial assistance and how useful the information was.  Ms. Jegley testified that she could not in good conscience recommend a reduction for Defendant.

Ms. Jegley testified that she makes clear to agents that they have no authority to make decisions on assistance, and that they are never to make any promises to anyone.  Ms. Jegley testified that when she meets with potential witnesses, she never makes any kind of promise, and that she waits until after the witness testifies or completes assistance before she makes a decision on substantial assistance.

AO72A
(Rev. 8/82)

Ms. Jegley testified that her decision that Brown, Defendant and others did not merit a Rule 35 reduction, was based solely on consideration of their candor, their truthfulness and their helpfulness and on nothing else.

Upon questioning by Defendant, Ms. Jegley testified that she was not aware of or forgot that Agent Tichenor had any contact with Defendant or Brown after the interview with Brown in October of 2009.   When questioned about the December 22, 2009 e-mail from Agent Tichenor to Brown, Ms. Jegley testified that she did not know that Agent Tichenor had sent an e-mail of the sort, and that Agent Tichenor had no authority to make any kind of representation.

## II.   Discussion:

A motion under Federal Rule of Criminal Procedure 35(b), "which the government can make only after imposition of the sentence, seeks a reduction based on 'a defendant's subsequent, substantial assistance in the investigation or prosecution of another.'" White v. United States, 998 F.2d 572, 574 (8th Cir.1993) (quoting Fed.R.Crim.P. 35(b)).   In analyzing the application of Rule 35(b), the Eighth Circuit "rel[ies] upon cases decided under § 5K1.1 of the United States Sentencing Commission Guidelines Manual (Substantial Assistance to Authorities) and 18 U.S.C. § 3553(e) (Limited Authority to Impose a Sentence Below a Statutory Minimum)." United States v. Marks, 244 F.3d 971, 973 n. 1 (8th Cir.2001).

The Supreme Court has held that the language of § 3553(e) and § 5K1.1 "gives the Government a power, not a duty, to file a motion when a defendant has substantially assisted." Wade v. United States, 504 U.S. 181, 185 (1992).   Only an unambiguous, unconditional promise to file a downward departure motion is binding on the government. United States v. Barresse, 115 F.3d 610, 612 (8th Cir.1997) (citing United States v. Coleman, 895 F.2d 501, 506 (8th Cir.1990)).

-21-

At the April 5, 2012 hearing, Defendant testified that Agent Tichenor made assurances to Defendant and Brown that they would receive a sentence reduction for the information that they provided regarding the Ross case.  Defendant testified that in December of 2008, Agent Tichenor told him that if his information was credible, that Defendant might get something, but that Agent Tichenor would need to talk to the prosecutor; and that shortly after the new year in January of 2009, Defendant had talked to Agent Tichenor and was told that all assistance decisions were up to the prosecutor.  Defendant's own testimony details that he was made aware of who made the decisions regarding assistance from the outset.

The Court notes that Brown also testified during the April 5, 2012 hearing that Agent Tichenor had made him aware that the prosecutor would be the one to make all assistance decisions.  Brown also testified that neither Agent Tichenor nor AUSA Jegley ever assured him that he or Defendant would receive a sentence reduction for the information that they provided.

In an effort to show that assurances were in fact made to Defendant and Brown, Defendant submitted the December 22, 2009 e-mail written to Brown wherein Agent Tichenor stated that he would "try and talk [Ms. Jegley] into getting some more help for you. I[n] the end she makes the final decisions though."  (Defendant Exhibit 3).  When questioned about this email, Agent Tichenor testified that he did not know why he said "more help," but conceded that the help referred to was in regard to a possible sentence reduction.  Contrary to what Defendant argues, the e-mail does not contain an explicit promise of a sentence reduction, and properly informed Brown that AUSA Jegley would have the final decision regarding a sentence reduction.  Agent Tichenor testified that he did not promise either Defendant or Brown a sentence reduction at any point in time, as he did not have the authority to make that decision.  Agent Tichenor's testimony

-22-

was credible, reasonable, and consistent with the principle that a law enforcement officer cannot make a binding promise obligating a prosecutor to file a Rule 35(b) motion unless the prosecutor has authorized the promise. See United States v. Fuzer, 18 F.3d 517, 521 (7th Cir.1994) (federal agents cannot make binding promises without authorization of the United States Attorney).

Defendant testified that he had not spoken or seen AUSA Jegley until the day of the hearing before the undersigned, so it is clear to the Court that AUSA Jegley provided no assurance to Defendant that he would receive a reduction in his sentence. As the record does not show that Defendant was made an unambiguous, unconstitutional promise, the Government's discretionary decision not to file a substantial assistance motion is subject to only limited review. See United States v. Wade, 504 U.S. at 186. There are two circumstances identified by the Wade Court that can precipitate judicial review of the government's discretionary decision not to file a motion for a sentence reduction, but the defendant must make a "substantial threshold showing" of one of them before a court may act. United States v. Marks, 244 F.3d 971, 975 (8th Cir. 2001)(citations omitted). First, the defendant may show that the government's "refusal was based on an unconstitutional motive," such as race or religion. Id. Second, the decision may qualify for court review if the defendant can make a threshold showing that "the prosecutor's refusal to move was not rationally related to any legitimate Government end," for example, that the decision was made arbitrarily or in bad faith. Id.

In Defendant's motion, he alleges that he earnestly believed that his race and the crime for which he was convicted were the primary motivating reasons why the Government chose not to file a Rule 35 motion on his behalf. The record does not support this allegation. At the hearing on the motion on April 5, 2012, AUSA Jegley testified that Defendant's race had no bearing on

her determination not to file a Rule 35 motion on his behalf. AUSA Jegley testified that in the case in question, three individuals did receive a Rule 35 motion, and each of those individuals was African American like Defendant.

AUSA Jegley testified and the Court finds her testimony credible that the reason the Rule 35 motion was not filed on Defendant's behalf was because she did not believe the information provided by Defendant or Brown to be credible. AUSA Jegley testified that the basis for not filing a Rule 35 motion on Defendant's behalf was that she did not find his core story to be credible and that the decision not to use Defendant or Brown as a witness was based solely on consideration of their candor, their truthfulness and their helpfulness, and on nothing else. Accordingly, Defendant failed to provide any evidence that the Government had an unconstitutional motive to file a Rule 35 on his behalf.

## III.    Conclusion:

Based on the foregoing the undersigned recommends that Defendant's Motion (Doc. 85) be denied. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 26th day of July 2012.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-24-